**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**ALLOCCO RECYCLING, LTD.,** )

)         **03 Civ. 3571 (RCC)(GWG)**

)                    **Plaintiff,**
)         **MEMORANDUM & ORDER**
                    **- against -**         )
                                            )
**JOHN DOHERTY, individually and as the**         )
**Commissioner of the New York City Department of**         )
**Sanitation, and THE CITY OF NEW YORK,**

                                            )

)                    **Defendants.**

                                            )

**RICHARD CONWAY CASEY, United States District Judge:**

Allocco Recycling, Ltd. ("Plaintiff"), which operates a fill-material transfer station in

Brooklyn, New York, brought this suit under 42 U.S.C. § 1983 and state law against John

Doherty, individually and as Commissioner of the New York City Department of Sanitation

("DSNY"), and New York City ("Defendants"). Plaintiff alleges deprivations of its rights under

the Commerce Clause, the Equal Protection and Due Process Clauses of the Fourteenth

Amendment, the Fifth Amendment Takings Clause, and New York law. These constitutional

and state-law violations allegedly occurred when Defendants denied Plaintiff's application to

expand the capacity of its transfer station and issued a moratorium on new or modified permits

for transfer stations. Defendants have moved to dismiss the Second Amended Complaint

("SAC") for failure to state a claim and on jurisdictional grounds. For the following reasons, the

motion is **GRANTED IN PART** and **DENIED IN PART**.

1

# I.    BACKGROUND

The Court assumes the truth of the allegations in the SAC for the purposes of this motion. Since 1995, Plaintiff has had a permit from DSNY to operate a fill-material transfer station at which it processes non-putrescible (that is, inorganic) solid-waste materials such as dirt, rock, stone, and concrete, which may be recycled and reused rather than disposed of at a landfill. (SAC ¶ 12.) According to Plaintiff's permit, the maximum allowable volume of waste that may be "bonded" at Plaintiff's site is 19,500 cubic yards.  (Id. ¶ 17.)  Plaintiff's permit originally allowed it to bond up to 6,666 cubic yards; its permit was renewed annually from 1995 to 2000. (Id. ¶ 18.)  In 2000, DSNY granted Plaintiff's application for an increase in bonding volume to 10,666 cubic yards.  (Id. ¶ 20.)  Plaintiff then applied to increase the volume to the maximum capacity of 19,500 cubic yards.  (Id. ¶ 21.)

DSNY informed Plaintiff that it would need to submit an environmental-impact statement pursuant to the City Environmental Quality Review Act before the application could be approved.  (Id. ¶ 23.)  Plaintiff submitted the impact statement, but DSNY informed Plaintiff by letter dated September 24, 2002 that it was terminating the environmental review and denying the application based on a report that suggested the City did not need any additional transfer-station capacity.  The letter stated:

> This is to inform you that the New York City Department of Sanitation (DSNY) has completed the Preliminary Report of the New York City Comprehensive Commercial Waste Management Study.  Based on the findings in this Report, the DSNY has determined, at this time, New York City has sufficient private transfer station capacity.  In accordance with this determination, the DSNY will not issue any new permits to non-operating transfer stations, or any permit modifications for expansions of transfer station capacity.  To effect this determination, the DSNY is terminating its City Environmental Quality Review . . . of the permit application for the above referenced transfer station.

(Id. ¶ 34.)  DSNY sent similar letters to approximately 20 other transfer-station applicants; 4 applicants did not receive such a denial letter, and some or all of these applications were approved.  (Id. ¶¶ 37-38.)  In December 2003, DSNY adopted Interim Siting Regulations that placed a moratorium on new non-putrescible transfer-station permits and on modifications to existing permits for such transfer stations.  (Id. ¶ 41.)  According to the SAC, which was filed on May 14, 2004, the moratorium was to last through July 2004.  (See id. ¶ 41.)

Plaintiff contends that the denial of modification to its permit was unlawful and also discouraged it from applying for a permit for a new facility that it had purchased in 2001.  (Id. ¶ 46.) Plaintiff purchased a property adjacent to its transfer-station site with the purpose of applying to DSNY for a permit to operate a transfer station for construction and demolition debris (the "construction-debris transfer station"), also non-putrescible waste.  (Id. ¶¶ 14-15.) Plaintiff contends that a fill-material transfer station and the proposed construction-debris transfer station together would allow it:

> to better compete in the marketplace and provide more cost efficient services and contribute to the region-wide and City-wide waste transfer and disposal industry. In addition, [Plaintiff] would be a more effective participant in the recycling industry in NYC, if it were able to fully utilize its entire permitted capacity at the fill material transfer station and if it were able to apply for a construction and demolition debris transfer station alongside.

(Id. ¶ 16.)   Although Plaintiff alleges that it "began the preparation of the necessary application papers for a construction and demolition debris transfer station" (id. ¶ 24), it concedes that it did not submit an application.

With regard to its Commerce Clause challenge, Plaintiff alleges that the solid-waste industry is a multi-billion-dollar industry and employs more than 350,000 workers.  (Id. ¶ 8.)  In 2002, 35 million tons of municipal solid waste was shipped interstate, and 49 out of 50 states

import or export solid waste.  (Id.)  Plaintiff "utilizes interstate channels of commerce, including truck and waterways," and its fill-material transfer site, as well as the proposed construction-debris transfer site, has access to a waterway to move materials.  (Id. at 13.)  By denying modification of Plaintiff's permit and by issuing the moratorium, Defendants have allegedly established New York City as a zone apart from the nation.  (Id. ¶ 47.)

Plaintiffs contend that Defendants are motivated by the interests of New York City alone and are therefore discriminating against interstate commerce.  (Id. ¶ 53.)  Denial of the permit and the regulations imposing a moratorium have impeded Plaintiff's "ability to compete for other fill materials (and construction and demolition debris) generated elsewhere.  Also, they impeded competition generally by establishing a cartel of operating transfer stations that exclude out-of-state companies."  (Id. ¶ 56.)  Defendants' actions also allegedly place an undue burden on interstate commerce.

Aside from Plaintiff's two theories of Commerce Clause violations, it also pleads deprivations of its rights to procedural due process, substantive due process, and equal protection.[1]  Plaintiff further claims that its property has been taken without just compensation and that Defendants have tortiously interfered with its prospective business advantage under state law.  Plaintiff seeks damages, attorney's fees and costs, and a declaratory judgment.

## II.    DISCUSSION

---

[1] Plaintiff's Sixth Claim for Relief is styled as one under § 1983 seeking damages, but does not specify what specific right was deprived.  Because § 1983 conveys no rights of its own "but merely provides a method for vindicating federal rights elsewhere conferred," Albright v. Oliver, 510 U.S. 266, 271 (1994) (internal quotation marks omitted), the Court construes the Sixth Claim for Relief as merely a prayer for damages and an allegation that the other violations were carried out under color of state law, rather than as a separate substantive claim.

Defendants have moved to dismiss Plaintiff's Commerce Clause, equal protection, due process, takings, and state-law claims on the merits; have moved to dismiss the takings claim as not ripe; and have moved to dismiss all claims related to Plaintiff's proposed construction-debris transfer station on standing and ripeness grounds. The Court, as it must, first addresses Defendants' jurisdictional challenges.

## A.      Subject-Matter Jurisdiction

Defendants argue that Plaintiff's takings claims and all claims arising out of the moratorium on new permits are not ripe and that Plaintiff lacks standing to challenge the moratorium as it relates to new permits. In addition, the Court raises <u>sua sponte</u> the issue of whether Plaintiff has standing to challenge Defendants' actions under the Commerce Clause. <u>See</u> <u>Thompson v. County of Franklin</u>, 15 F.3d 245, 248 (2d Cir. 1994) (noting that the court has an independent obligation to examine standing because it is an issue of the court's subject-matter jurisdiction). The Court concludes that Plaintiff has sufficiently alleged standing on the Commerce Clause claims, although the Court has concerns about the ultimate resolution of the issue, and has standing to challenge the moratorium on new permits. The Court also concludes that the takings claims are not ripe and must be dismissed, but that the claims relating to moratorium on new permits are ripe for adjudication.

### 1.      Standing

Defendants maintain that Plaintiff has no standing to challenge the moratorium on new permits, and the Court has concerns about Plaintiff's standing to raise its Commerce Clause claims. The requirement of standing embraces both a constitutional limitation on federal courts' subject-matter jurisdiction and prudential limitations on the exercise of that jurisdiction. <u>Gladstone Realtors v. Vill. of Bellwood</u>, 441 U.S. 91, 99 (1979). Thus, a plaintiff must meet

both the constitutional requirements for standing under Article III and the judicially created prudential requirements.  See Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 184 (2d Cir. 2001) ("Prudential and constitutional rules of standing are alike 'threshold determinants of the propriety of judicial intervention.'" (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975))).

### (a)　　Plaintiff Has Constitutional Standing

To meet the case-or-controversy requirement of Article III, a plaintiff must show three things. The plaintiff must have suffered an injury in fact—an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  Next, the injury must be fairly traceable to the defendant's challenged action.  Id.  Finally, it must be likely that the injury will be redressed by a judicial decision in the plaintiff's favor.  Id. at 561.  Plaintiff has met this standard with regard to both its challenge to the new-permit moratorium and its Commerce Clause claims.  It has suffered an injury in fact because it will not be able to operate a new construction-debris transfer station, thereby economically harming Plaintiff.  The injury is tied to Defendants' conduct in adopting and maintaining the policy against new permits, and a ruling in favor of Plaintiff on its claims would likely redress the injury because, according to the complaint, the only barrier to the operation of the new transfer station is the moratorium in place due to the Interim Siting Regulations.

Defendants' argument to the contrary is unavailing.  They contend that Plaintiff has suffered no injury in fact relating to the new-permit moratorium because Plaintiff has yet to be denied such a permit and thus has not been affected personally by the moratorium.  New York City law requires a permit to operate a commercial-waste transfer station, and DSNY, which controls the issuance of such permits, has promulgated a regulation prohibiting the opening of

new facilities.  See N.Y. City Admin. Code §§ 16-130(b), 16-131.  Plaintiff alleges that it purchased the adjacent land with the intent of applying for a permit and operating a construction-debris transfer station and is now unable to do so because of the moratorium on new permits.  The complaint also fairly alleges that the only barrier to Plaintiff's operation of the new facility is the moratorium and that Plaintiff's application, if made, would be denied.  (See SAC ¶ 33 (alleging that applicable zoning laws permit operation "as of right" of a construction-debris transfer station on the site that Plaintiff purchased); id. ¶ 46 (alleging that the moratorium deterred an application because it prohibits the issuance of any permits for new transfer stations).)  Thus, Plaintiff has sufficiently alleged a personal injury that is not speculative or hypothetical.  Cf. City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) (holding that an injury was too speculative to convey standing to obtain an injunction because the plaintiff did not allege that he would again "be wronged in a similar way"); Lee v. FDIC, No. 95 Civ. 7963 (LMM), 1997 WL 570545, at *5 (S.D.N.Y. Sept. 15, 1997) (holding that plaintiffs who planned to apply for credit lacked standing to challenge the defendant's credit practices because they did not allege that the planned applications would likely be denied).

Plaintiff accordingly has constitutional standing to challenge the new-permit moratorium.  The Court also concludes that Plaintiff has constitutional standing to bring Commerce Clause challenges related to both the new-permit and permit-modification policies.  However, as to the Commerce Clause claims, the Court considers the prudential standing requirements.[2]

### (b)    Plaintiff Has Sufficiently Pled Prudential Standing

---

[2] Defendants do not argue, and the Court does not find, any obvious deficiency in the prudential standing of Plaintiff as to the claims for deprivation of its due process and equal protection rights.

In addition to the constitutional requirements, there are prudential considerations to determine whether a plaintiff has standing.  See Nash v. Califano, 613 F.2d 10, 14 (2d Cir. 1980).  One of those prudential considerations is whether the interest that a plaintiff seeks to protect falls within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," to render the plaintiff the proper party to raise a claim under the statutory or constitutional provision.  Assoc. of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970). On a motion to dismiss, the Court must only examine the allegations in the complaint to determine whether Plaintiff has met the prudential-standing requirements.  See Nash, 613 F.2d at 14.  Therefore, the Court must determine whether Plaintiff's interests as alleged in the complaint are within the zone of interests to be protected by the Commerce Clause.

An examination of the Commerce Clause analysis is useful in determining whether the Plaintiff's interests fall within the relevant zone of interests to be protected.  See Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth., 389 F.3d 491, 499 (5th Cir. 2004). The Commerce Clause provides Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.  The Commerce Clause is an affirmative grant of power to Congress, but it also contains a dormant or negative component that limits states' authority to inhibit interstate commerce.  Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 74 (2d Cir. 1998).  Plaintiff's challenges to Defendants' actions here fall under the so-called dormant Commerce Clause.  The issue is whether Plaintiff has standing to challenge Defendants actions as being discriminatory against out-of-state economic interests or whether the actions are excessively burdensome to

interstate commerce.  See United Haulers Ass'n., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 261 F.3d 245, 255 (2d Cir. 2001).

The rationale of the dormant Commerce Clause with respect to discriminatory laws is to prohibit local economic protectionism.  See C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390 (1994); Nat'l Solid Waste Mgmt., 389 F.3d at 499.  Discrimination under the dormant Commerce Clause "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994).  The relevant zone of interests is therefore protection of out-of-state economic interests.  See Nat'l Solid Waste Mgmt., 389 F.3d at 500.

The Fifth Circuit's decision in National Solid Waste Management is particularly instructive here.  In that case, the plaintiffs collected, processed, and disposed of solid waste and shipped the waste to transfer stations and landfills that they operated or that were operated by affiliates.  Id. at 495-96.  The plaintiffs did not ship any waste outside of the state and all of the waste originated within the state.  Id. at 496.  The Fifth Circuit, raising the issue sua sponte in reviewing the district court's judgment after a bench trial, held that the plaintiffs did not have prudential standing to challenge flow-control ordinances that required all waste within a designated region to be deposited at a specific landfill on the ground that the ordinance was facially discriminatory.  See id. at 499-500.  The court explained that the plaintiffs did not ship any waste out of state, or ship any waste from out of state into the state, and did not allege that they had any plans to do so.  Id.  The plaintiffs lacked standing to challenge the ordinances for facially discriminating against out-of-state interests because the "plaintiffs' injury [was] not related to any out-of-state characteristic of their business."  Id. at 500.

9

On the facts alleged in the complaint, Plaintiff's injuries here seem to have little relation to out-of-state economic interests. Plaintiff merely alleges that a modified permit for increased fill-material capacity and a construction-debris permit would allow it to "better compete in the marketplace . . . and contribute to the region-wide and City-wide waste transfer and disposal industry," (SAC ¶ 16) and that Defendants' actions have impeded its "ability to compete for other fill materials (and construction and demolition debris) generated elsewhere" (Id. ¶ 56).[3] Although far from clear, the allegations in the complaint must be deemed sufficient to establish that Plaintiff's asserted interests are within the zone of interests protected by the facial-discrimination theory of the dormant Commerce Clause. Unlike in National Solid Waste Management, this is a motion to dismiss, on which the Court must "presume[] that general allegations embrace those specific facts that are necessary to support the claim." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990).[4] The terms "region-wide" and "elsewhere" must be taken, at this point, to include allegations that Plaintiff ships or receives fill-material waste from out of state and plans to ship or receive construction-debris waste from out of state. Therefore,

_____

[3] Plaintiff also alleges that Defendants have established "a cartel of operating transfer stations that exclude[s] out-of-state companies." (SAC ¶ 56.) But Plaintiff is an in-state company that would be a part of any "cartel," rather than harmed by it. (Id. ¶ 1 ("[P]laintiff . . . was and still is a New York State domestic corporation with offices in the County of Kings and in the City and State of New York.").) Plaintiff does not have standing to challenge the moratorium on the basis that it harms third parties. See Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 80 (1978).

[4] A court is not bound by the allegations in the complaint and may consider extraneous evidentiary material when a defendant challenges the factual allegations that supply the basis for the court's purported subject-matter jurisdiction. Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001). However, if the challenge is that the facts alleged are insufficient to support that jurisdiction, then the Court must presume the truth of the allegations and draw all reasonable inferences in the plaintiff's favor. Id. Here, because the issue of Plaintiff's standing as to Commerce Clause claims is raised sua sponte and no additional evidentiary material has been presented, the Court confines itself to the allegations in the complaint and draws all inferences in Plaintiff's favor.

the Court holds that at this stage of the litigation Plaintiff has met the requirements for prudential standing as to its claim that the moratorium facially discriminates against out-of-state commerce. The Court intimates no view on whether such standing will be confirmed after the development of the factual record.

The Court also concludes that Plaintiff has alleged sufficient facts to establish standing as to the claim that the moratorium on modifications and new permits excessively burdens interstate commerce. Under this theory of the dormant Commerce Clause, "'where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" United Haulers, 261 F.3d at 256 (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)). The Fifth Circuit held in National Solid Waste Management that if a "plaintiff is involved in interstate commerce" and if "the plaintiff's interstate commerce is burdened by the ordinance in question," the zone-of-interests test is satisfied. 389 F.3d at 500 (emphasis omitted). The court noted that "[e]ven though the plaintiffs do not ship any garbage collected . . . out of state, they are engaged in interstate commerce, and their interstate commerce is allegedly burdened by the ordinances." Id. at 500–01 (emphasis omitted).

The same reasoning applies here. Plaintiff has alleged that it "utilizes interstate channels of commerce." (SAC ¶ 13.) As explained above, it has also made general allegations that its interstate commerce is burdened by the moratorium on modified and new permits. The allegations that it would use the increased volume and new site to engage in region-wide waste management and to receive waste from elsewhere, as well as the allegation that its "rights to engage in interstate commerce have been violated" (id. ¶ 66), are adequate at this point to allege

11

that Plaintiff's interstate commerce has been burdened by the moratorium. Accordingly, the Court finds that the prudential-standing requirements are met as to the claim that the Defendants have excessively burdened interstate commerce.

### 2.    Ripeness

Defendants also maintain that the takings claims and the claims arising from the moratorium on new permits are not ripe. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807-08 (2003) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967)).

### (a)    The Claims Related to the Moratorium on New Permits Are Ripe

To determine whether administrative action, such as DSNY's moratorium, is ripe for review requires the Court "to evaluate the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." Id. at 808. On the first prong of the inquiry, the Supreme Court has noted that "a[n] administrative regulation is not ordinarily considered the type of action 'ripe' for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." Nat'l Wildlife Fed'n, 497 U.S. at 891. However, the doctrine of ripeness contains an exception if further administrative proceedings would be futile. Shalala v. Ill. County on Long Term Care, Inc., 529 U.S. 1, 13 (2000). There is no requirement that a

plaintiff make a futile application for an issue to be ripe for adjudication.  Williams v. Lambert,

46 F.3d 1275, 1280 (2d Cir. 1995).  Here, the Court is obligated to accept the allegations that the

moratorium applies to all non-putrescible waste transfer stations, that the construction-debris

station would process such waste, and that the moratorium, which is based on "interim"

regulations, continues to prevent Plaintiff from operating the construction-debris transfer station.

Given these facts, a further application to DSNY would be futile, and thus the claims relating to

the moratorium on new permits are ripe for resolution.[5]

### (b)    The Takings Claims Are Not Ripe

A more particularized two-prong test exists for the takings claims under Williamson

County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172 (1985).  "The first

prong requires the government entity charged with enforcing the regulation to have rendered a

'final decision.'  The second prong requires the plaintiff to have sought compensation from the

state if the state provides a 'reasonable, certain and adequate provision for obtaining

compensation.'"  Southview Assocs., Ltd. v. Bongartz, 980 F.2d 84, 95 (2d Cir. 1992) (quoting

Williamson County, 473 U.S. at 186, 194 (internal citation omitted)).  Defendants maintain that

the takings claim relating to the fill-material transfer station is not ripe under prong two, while

the takings claim relating to the proposed construction-debris station fails under both prongs.

The Court agrees that, regardless of whether there has been a final decision on both

desired uses of Plaintiff's land, it has not alleged to have sought compensation from the relevant

New York authorities.  A plaintiff "has not suffered a violation of the Just Compensation Clause

---

[5]  For the same reasons, Defendants' argument that Plaintiff failed to exhaust administrative
remedies before challenging the moratorium on new permits fails.  See Shalala v. Ill. County on
Long Term Care, Inc., 529 U.S. 1, 13 (2000) (noting that the doctrine of exhaustion of
administrative remedies also contains a futility exception).

until the [plaintiff] has unsuccessfully attempted to obtain just compensation through the procedures provided by the State." Williamson County, 473 U.S. at 195. "Thus, to withstand a motion to dismiss, an aggrieved plaintiff must allege, not only a taking, but that compensation was sought via state procedures and denied." New Holland Vill. Condo. v. DeStaso Enters. Ltd., 139 F. Supp. 2d 499, 504 (S.D.N.Y. 2001).

Plaintiff concedes that it has not sought compensation prior to this suit, but responds in its brief, without any support, that New York has no mechanism for obtaining compensation for a regulatory taking. This naked allegation is found nowhere in the complaint and is wrong as a matter of law. Well-settled law in this Circuit establishes that New York does provide adequate means for obtaining compensation for a regulatory taking. See, e.g., RKO Del., Inc. v. City of New York, No. CV 002592 (DGT), 2001 WL 1329060, at *5 (E.D.N.Y. Aug. 30, 2001); Goldfine v. Kelly, 80 F. Supp. 2d 153, 161 (S.D.N.Y. 2000); Gottlieb v. Vill. of Irvington, 69 F. Supp. 2d 553, 560 (S.D.N.Y. 1999); Deepwells Estates, Inc. v. Inc. Vill. of Head of Harbor, 973 F. Supp. 338, 348 (E.D.N.Y. 1997); Riverdale Realty Co. v. Town of Orangetown, 816 F. Supp. 937, 943 (S.D.N.Y. 1993); Sudarsky v. City of New York, 779 F. Supp. 287, 301 (S.D.N.Y. 1991).

The New York Constitution contains a takings clause, see N.Y. Const. art I, § 7(a), which may be violated by a local regulation that "denies an owner economically viable use of his [or her] property, or . . . does not substantially advance legitimate State interests." Manocherian v. Lenox Hill Hosp., 643 N.E.2d 479, 482 (N.Y. 1994) (internal quotation marks and emphasis omitted). The New York Court of Appeals noted in Manocherian, "While the typical taking occurs when the government acts to physically intrude upon private property, governmental regulations which limit owners' rights to possess, use or dispose of property may also amount to

14

a 'taking' of the affected property." Id.  Thus, New York does provide a means for obtaining

compensation for regulatory takings that Plaintiff must first pursue under Williamson County.

The failure to do so renders Plaintiff's takings claims unripe.  Those claims are accordingly

dismissed.

**B.      Motion to Dismiss for Failure to State a Claim**

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure

12(b)(6), the Court must assume the facts in the complaint to be true, make all inferences in the

plaintiff's favor, and may not grant the motion unless it appears beyond doubt that the plaintiff

can prove no set of facts that would entitle it to relief.  Courtenay Communications Corp. v. Hall,

334 F.3d 210, 213 (2d Cir. 2003).

**1.      Plaintiff Has Stated Claims For Commerce Clause Violations**

Defendants argue that Plaintiff's claims under the Commerce Clause should be dismissed

on the merits because Plaintiff has not sufficiently alleged that the challenged actions are

discriminatory or have excessively burdened interstate commerce.   In assessing whether

Plaintiff has stated a claim, the Court must first determine whether the challenged actions

"regulate[] evenhandedly with only 'incidental' effects on interstate commerce, or discriminate[]

against interstate commerce." Hughes v. Oklahoma, 441 U.S. 322, 336 (1979).  If a restriction

on commerce treats out-of-state economic interests differently from in-state interests, then it is

invalid unless "it is 'demonstrably justified by a valid factor unrelated to economic

protectionism.'" Automated Salvage Transport, Inc., 155 F.3d at 74 (quoting Wyoming v.

Oklahoma, 502 U.S. 437, 454 (1992)).  The Supreme Court has explained, "[W]hatever [a

regulation's] ultimate purpose, it may not be accomplished by discriminating against articles of

commerce coming from outside the State unless there is some reason, apart from their origin, to

treat them differently." City of Philadelphia v. New Jersey, 437 U.S. 617, 626-27 (1978). Thus, when a regulation, "whether on its face or in effect, discriminates against interstate commerce, it is virtually per se invalid" unless it can be justified by the local benefits and the unavailability of nondiscriminatory alternatives to achieve those benefits. Swedenburg v. Kelly, 358 F.3d 223, 238 (2d Cir. 2004). If the regulation is nondiscriminatory, however, and the restriction has only incidental effects on interstate commerce, it is valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142.

Plaintiff has stated a claim that the moratorium on modified and new permits and the decision to deny its application discriminate against out-of-state commerce. Plaintiff relies on the Fourth Circuit's decision in Environmental Technology Council v. Sierra Club, 98 F.3d 774 (4th Cir. 1996), to argue that regulations tied to local need discriminate against interstate commerce. There, South Carolina had enacted a series of statutes and regulations that limited the amount of hazardous waste coming in from other states. In one regulation that the South Carolina Department of Health and Environmental Control promulgated, permits for establishing or enlarging hazardous-waste facilities were tied to local need only. Id. at 781. The Fourth Circuit held that this regulation was not an evenhanded cap that had the same effect on in-state and out-of-state economic interests because "[w]hile the limit once imposed applies equally to out-of-state and in-state wastes, in effect, it guarantees in-state generators of waste space because the limit can always be raised in order to meet in-state needs." Id. at 788. The court also concluded that the regulation could not be justified by any of South Carolina's articulated rationales for the local-needs test. Id.

Environmental Technology Council provides support for Plaintiff's allegation that the moratorium on permits for new and expanded non-putrescible transfer stations based solely on

local need is per se invalid under the Commerce Clause. The same discriminatory effect is apparent here—the City has prohibited expansion and establishment of transfer stations that has the effect of providing for local need and denying access to waste from outside New York State.[6]

The Court cannot hold that Plaintiff will be unable to prove any set of facts to establish a per se violation of the Commerce Clause.

Plaintiff has also stated a claim for a Commerce Clause violation based on excessive burdens on interstate commerce. Under Pike, a regulation that is not discriminatory but incidentally burdens interstate commerce runs afoul of the dormant Commerce Clause when the burdens placed on interstate commerce are clearly excessive in relation to the local benefits. Gary D. Peake Excavating, Inc. v. Town Bd., 93 F.3d 68, 75 (2d Cir. 1996). Plaintiff has alleged that the local benefits are incidental and even nonexistent. According to the complaint, DSNY released a study concluding that private transfer stations have little or no adverse effects on air quality, odor, noise, traffic, water quality, public health, and neighborhood character. (SAC ¶ 45.) Plaintiff also alleges that Defendants' conclusion about local need for non-putrescible transfer stations was based on inaccurate and insufficient data. (Id. ¶¶ 45, 62.) In addition, the complaint states that the moratorium has burdened interstate commerce in that it prevents the flow of non-putrescible waste from outside the state to in-state transfer stations and stifles the economic activities associated with the interstate shipping, storage, and disposal of such waste.

---

[6] Defendants' attempt to distinguish Environmental Technology Council is based on a misreading of the case. They maintain that the Fourth Circuit held that the regulations discriminated against out-of-state interests because they capped out-of-state waste and set discriminatory quotas. The Fourth Circuit considered four separate regulations and found them to be discriminatory for different reasons; other regulations did explicitly impose limits on out-of-state waste and a quota system to give preference to in-state waste, but the local-needs based permit regulation applicable here contained no such provisions. See Envtl. Tech. Council, 98 F.3d at 785-88.

If these allegations are true, Plaintiff could prove that they excessively burden interstate commerce because they have little local benefit.

Defendants unconvincingly argue that the allegations regarding the moratorium's burden on interstate commerce are only speculative and concern Plaintiff's own business rather than interstate commerce. The former contention is irrelevant on a motion to dismiss because Plaintiff needs only to allege, not prove, its claims. The latter argument also fails because, as explained with regard to Plaintiff's standing to assert Commerce Clause violations, Plaintiff has alleged sufficient facts on a motion to dismiss that its interstate commerce is burdened by the moratorium. Whether Plaintiff actually engages, or intends to engage, in any interstate commerce that is burdened by the moratorium on new and modified permits is a factual issue that must be addressed at another time. Accordingly, the motion to dismiss the Commerce Clause claims is denied.

### 2. Plaintiff Has Stated A Claim For an Equal Protection Violation

Plaintiff alleges that the denial of its application for a modified permit deprived it of its rights to equal protection of the laws under the Fourteenth Amendment because Defendants did not deny the applications of four other applicants. Plaintiff maintains that there was no rational basis for the difference in treatment and relies on Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam). "[A]n Olech-type equal protection claim focuses on whether the official's conduct was rationally related to the accomplishment of the work of their agency." Bizzarro v. Miranda, 394 F.3d 82, 88 (2d Cir. 2005).

Defendants argue that a necessary element of an equal protection claim is absent here, that is, selective treatment based on an impermissible factor such as race or malicious intent to harm. However, the Court in Olech held that the plaintiff stated a cause of action by alleging

that the defendant had treated her differently than others similarly situated without any rational basis for the disparate treatment. 528 U.S. at 565. The Court held that "[t]hese allegations, quite apart from the [defendant's] subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis." Id. (emphasis added). The Olech Court also declined to reach the "alternative theory" that the plaintiff had stated a claim based on the defendant's subjective ill will motivating the selective treatment. Id. Justice Breyer wrote separately in concurrence to emphasize his view that the additional element of impermissible animus alleged in the plaintiff's complaint was necessary to minimize the danger that equal protection violations could be founded upon arbitrary zoning decisions. See id. at 565-66 (Breyer, J., concurring). The Supreme Court therefore considered claims based on disparate treatment without a rational basis as distinct from claims based on disparate treatment motivated by impermissible considerations or intent. Justice Breyer's concurrence serves to highlight that distinction drawn in the majority opinion.

Second Circuit decisions after Olech support this distinction. In Cobb v. Pozzi, 363 F.3d 89, (2d Cir. 2004), for example, the court analyzed claims for selective prosecution differently from those alleging that the defendants treated the plaintiffs disparately from similarly situated individuals without a rational basis. In the court's words:

> Unlike their selective prosecution claim, the plaintiffs' Olech-based equal protection claim is not dependant on their ability to prove that they were disciplined for an impermissible reason. Rather, under Olech, the plaintiffs can recover if they can show that they were treated differently from similarly situated [individuals] . . . and that "there was no rational basis for the difference in treatment."

Id. at 110 (quoting Olech, 528 U.S. at 564). Defendants are incorrect that Plaintiff has fatally failed to plead that Defendants were motivated by an impermissible factor in their decisionmaking because Olech does not require such pleading.

Defendants also contend that Plaintiff has failed to plead it was similarly situated to the four applicants whose applications were granted. This element is necessary in any equal protection claim because "[t]he Equal Protection Clause requires that the government treat all similarly situated people alike." Harlan Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (emphasis added). According to Defendants, Plaintiff has effectively pleaded itself out of court because it alleges in the complaint that the four approved applicants were operating under consent orders from the New York State Department of Environmental Conservation ("DEC") and therefore Plaintiff was not similarly situated to the successful applicants. The complaint does not identify, nor do Defendants, what sort of "consent orders" these were or how they distinguished Plaintiff's application from the four that may have been approved. Plaintiff contends that these consent orders, whatever they were, did not render it differently situated from the approved applicants because Plaintiff had registered its fill-material transfer station with the DEC and therefore had the equivalent of a consent order. (See SAC ¶ 92.) Defendants reply that the consent orders did in fact make the successful applicants and Plaintiff differently situated. But this is a futile argument on a motion to dismiss when the Court must accept as true the allegations in the complaint. Plaintiff has alleged that it had the functional equivalent of a DEC consent order and without more factual development the Court cannot conclude it is incorrect as a matter of law. Therefore, Defendants' motion to dismiss Plaintiff's equal protection claim is denied.

### 3. The Due Process Claims

Plaintiff alleges violations of both procedural and substantive due process. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Matthews v. Eldridge, 424 U.S. 319, 332 (1976). The concept of substantive due process found in the Fifth and Fourteenth Amendments "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 301-02 (1993).

"The first question in any due process inquiry is whether the plaintiff has a constitutionally protected interest." DeMichele v. Greenburgh Cent. Sch. Dist. No. 7, 167 F.3d 784, 789 (2d Cir. 1999); see also Flores, 507 U.S. at 302 ("'Substantive due process' analysis must begin with a careful description of the asserted right . . . ."). Defendants argue that Plaintiff has failed to plead a protected right or liberty interest on which to base a claim for deprivation of substantive and procedural due process. Plaintiff maintains that it has a property interest in the modified permit and a liberty interest in pursuing its chosen trade or business.

(a)     The Applicable Legal Standards

The initial difficulty with the question of Plaintiff's purported property and liberty interests is whether they must be characterized as interests in the use of Plaintiff's land as fill-material and construction-debris transfer stations or as interests in the practice or the occupation of a transfer-station operator. This distinction between claims by plaintiffs denied uses of their land and claims by plaintiffs denied licenses to pursue particular occupations makes a significant analytic difference. See RRI Realty Corp. v. Inc. Vill. of Southampton, 870 F.2d 911, 918 n.4 (2d Cir. 1989). With regard to due process violations based on denials of licenses to engage in

occupations, plaintiffs "have a liberty interest in earning a livelihood and are normally not required to show an entitlement to the license they seek in order to state a claim; their liberty interest is impaired if their license application is arbitrarily denied." Id. Claims that land-use applications have been unconstitutionally denied, however, require plaintiffs to show a legitimate claim to entitlement to the permit or license. See id. at 917. To do so, the plaintiff must establish that "'absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted.'" Id. (quoting Yale Auto Parts, Inc. v. Johnson, 758 F.2d 54, 59 (2d Cir. 1985)).

Plaintiff makes both claims that it was deprived of permits to which it had a property entitlement and that it was denied its liberty interest in engaging in a certain business. The permit regulation at issue provides:

> It shall be unlawful for any person . . . to conduct, operate or use any pier or part thereof, or any piece or parcel of land or land under water within the city as a dump or as a non-putrescible solid waste transfer station or putrescible solid waste transfer station, or for a fill material operation without having first obtained for each pier or part thereof, or for each piece or parcel of land or of land under water, in addition to any other permit required by law, a permit from the [DSNY] commissioner . . . .

N.Y. City Admin. Code § 16-130. The permit scheme is both a land-use regulation because it is tied to the particular parcel of land being used for a waste transfer station and a regulation on an occupation because no one may engage in the business of operating a dump or waste transfer station in New York City without a permit. The Court therefore considers Plaintiff's purported property interest under the line of cases that require a legitimate entitlement to a land-use permit as a matter of state or local law and Plaintiff's purported liberty interest under the analysis for occupational restrictions.

**(b)      Plaintiff Lacks a Cognizable Property Interest**

Plaintiff maintains that it has a cognizable property interest in the modified permit because the maximum volume for its fill-material transfer station has already been approved; the modification would simply allow it to utilize the full capacity of the station.[7] Defendants counter that DSNY has the discretion to grant or deny the modification and that the processing of an application to expand the station is not merely a ministerial task.

"When alleging a property interest in a public benefit, [a] plaintiff must show 'a legitimate claim of entitlement' to such interest." Sanitation & Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 995 (2d Cir. 1997) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)). "[T]he question of whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted." Yale Auto Parts, 758 F.2d at 59. Thus, when an agency has substantial discretion under state or local law to grant or deny a license or permit, the plaintiff has no legitimate claim of entitlement. See Sanitation & Recycling Indus., Inc., 107 F.3d at 995; Colson ex rel Colson v. Sillman, 35 F.3d 106, 108 (2d Cir. 1994) ("Whether the benefit invests the applicant with a 'claim of entitlement' or merely a 'unilateral expectation' is determined by the amount of discretion the disbursing agency retains."). Applying the test articulated in Yale Auto Parts requires focusing on "the degree of discretion enjoyed by the issuing authority, not

---

[7] Plaintiff does not respond to Defendants' argument that it has no property interest in the permit for a construction-debris transfer station and appears to concede this point. Plaintiff's only argument on the issue of a cognizable property interest is that it is not seeking a new permit which DSNY has discretion to deny, but rather a modification to a preexisting permit, the processing of which is a mere ministerial duty. The Court concludes that Plaintiff has abandoned the argument that it has a property interest in a new permit for the construction-debris transfer station. See Ortho Pharm. Corp. v. Cosprophar, Inc., 828 F. Supp. 1114, 1129 (S.D.N.Y. 1993) (holding that failure to argue a contested claim constitutes abandonment of the claim), aff'd 32 F.3d 690 (2d Cir 1994).

the estimated probability that the authority will act favorably in a particular case." RRI Realty Corp., 870 F.2d at 921. A property interest arises only if the degree of discretion is so low "as to virtually assure conferral of the benefit." Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996).

Plaintiff does not dispute this statement of the law, but contends that DSNY has only a ministerial and not discretionary function in processing applications for permits. Resolution of this issue is proper on a motion to dismiss because it is a question of law. See Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999) ("In almost all cases, the existence of a federally protectable property right is an issue of law for the court."); Gagliardi v. Vill. of Pawling, 18 F.3d 188, 192 (2d Cir. 1994) (resolving issue of a regulatory body's discretion on a motion to dismiss and noting that "[t]he issue of whether an individual has . . . a property interest is a question of law."). The Court must look to local law to determine the degree of DSNY's discretion. See Sanitation & Recycling Indus., Inc, 107 F.3d at 995 (looking to local law to determine whether the substantial discretion of a regulatory body results in no legitimate claim of entitlement).

Section 16-131 of the New York City Administrative Code provides that the commissioner of DSNY "shall issue permits to such persons or public agencies engaged in use of . . . lands . . . within the city as . . . non-putrescible solid waste transfer stations." N.Y. City Admin. Code § 16-131(c). In addition, the commissioner "shall issue permits every six months to persons or public agencies engaged in use of . . . lands . . . for fill material operations." Id. § 16-131(d). The Administrative Code also provides:

> The commissioner shall be responsible for the issuance, renewal, suspension and revocation of permits required by section 16-130 of this chapter. An application for such a permit shall also be presented by the department to the New York city trade waste commission for review by such commission. The commissioner shall

consider the recommendations of such commission in making a determination pursuant to this section.

Id. § 16-131.1.

DSNY may refuse to issue or renew a permit under three specific provisions.[8]  See id. § 16-131.1(a)-(c).  Plaintiff argues that DSNY's discretion is limited to these specific provisions, making the processing and approval of any application to which these provisions do not apply a ministerial act.  Plaintiff relies on the canon of statutory interpretation inclusio unius est exclusio alterius (the inclusion of one is the exclusion of the other) in that it claims the explicit provisions for denial of a permit are exclusive and do not leave room for any implied discretion.  The only case that the parties have identified, and that the Court has found, that addresses DSNY's discretion under the permit regime rejected this argument.  Because it is the only case directly on point, a considerable discussion of its reasoning is required.

In Todino Brothers Recycling, Inc. v. City of New York, No. 101267/03 (N.Y. Sup. Ct. Oct. 10, 2003) (slip op.), the plaintiff ("Todino") sought an order compelling DSNY to complete review of, and grant, its application for modification to a fill-material transfer station permit. DSNY had denied the application, sending to Todino a similar letter to the one it sent to Plaintiff here.  See id. at 3.  Todino argued to the court that Administrative Code section 16-131.1 did not provide DSNY with the discretion to deny a permit for any reason other than those explicitly listed.  The court noted that section 16-131.1 obligates DSNY to "consider the recommendations of [the trade waste commission] in making a determination" on the issuance of permits, and reasoned that: (1) the responsibility to make a "determination" on a permit necessarily includes the discretion to grant or deny such permit, and (2) the reference to recommendations of the

_____

[8] The Administrative Code grants authority to the commissioner of DSNY.  The Court refers to DSNY as the decisionmaking body solely for purposes of convenience.

trade waste commission means that DSNY can consider in exercising that discretion factors other than those explicitly listed in section 16-131.1. See id. at 5. The court held that "[t]his language does not set ministerial limitations on the DSNY's discretion." Id.

The court also relied on a general principle of New York administrative law, citing a New York Court of Appeals decision, Barton Trucking Corp. v. O'Connell, 165 N.E.2d 163 (N.Y. 1959). There, the Court of Appeals held that "the power to withhold a license for good cause, as well as the standards defining good cause, need not be expressly delegated where, by fair implication in light of the statutory purpose, such power has been implicitly delegated." Id. at 166. The Court of Appeals also noted in Barton that "'[a] power to grant a privilege to one is inconsistent with the possession on the part of another of an absolute right to exercise such privilege.'" Id. (quoting People ex rel. Schwab v. Grant, 27 N.E.2d 964, 967 (1891)). Based on Barton, the court in Todino held that Administrative Code section 16-131 implicitly delegated to DSNY the discretionary authority to deny permits based on the lack of local need.

Plaintiff makes two arguments in response to Todino. First, it maintains that the decision is simply wrong. Second, it argues that the Supreme Court also recognized in Todino that the processing, as opposed to approval, of applications is a ministerial duty.

As to the first argument, a federal court's role in deciding a question of state law that has not been resolved by the state's highest court here, the degree of DSNY's discretion in approving permit applications is to predict how the state's highest court would rule on the matter. DiBella v. Hopkins, 403 F.3d 102, 111 (2d Cir. 2005). Plaintiff is quite right that the Court need not adopt Todino's conclusion if it is convinced that the New York Court of Appeals would decide otherwise. See id. at 112 (noting that a federal court may disregard lower state court decisions if it is convinced that the state's highest court would decide otherwise). Indeed, DiBella dealt with

decisions of intermediate state courts; here, the Court has only a single unpublished decision of a state trial court on point. While federal courts must give the "fullest weight" to decisions of the state's highest court when deciding questions of state law, they give only "proper regard" to relevant lower-court rulings. Santalucia v. Seabright Transp., Inc., 232 F.3d 293, 297 (2d Cir. 2000). Todino only guides this Court, therefore, to the extent that it persuasively applies New York Court of Appeals decisions. The Court must examine the Court of Appeals precedent on which Todino relied in reaching its conclusion.

In Barton, the New York City Commissioner of Licenses ("Commissioner") denied the petitioner, a trucking corporation, a public cart license because one of its officers had been convicted of extortion, making the corporation an unfit party to operate public carts. 165 N.E.2d at 165. The petitioner challenged the decision as arbitrary and capricious because the relevant section of the Administrative Code did not expressly provide for denial of licenses on the ground of unfitness. See id. at 166. In reversing the trial court, the Appellate Division agreed with the petitioner's argument, concluding that the statute provided for licensing only for purposes of identification, revenue, and controlling of public-cart fees charged to customers, and thus did not expressly or by clear implication grant discretion to deny on the basis of fitness or character. Id. at 166. The Court of Appeals disagreed. It began from the premise that "any discretionary powers exercised by an administrative officer must be delegated to him by statute, and that such delegation must be accompanied by standards to guide the exercise of administrative discretion." Id. But the power to deny a license for "good cause" and the standards to determine good cause need not be expressly stated if they may be fairly implied from the statutory purpose. See id.

The Court of Appeals reasoned that the requirement of a license and the establishment of a licensing authority implies that the administrative official is not required to grant a license in

27

all cases, but has discretion to deny one "'when, in his judgment, he thinks the public interest requires it.'" Id. (quoting Schwab, 27 N.E. at 967). The court also noted the statutorily granted authority to the Commissioner over "the granting, issuing, transferring, renewing, revoking, suspending and canceling of all licenses and permits," and the Commissioner's ability to take testimony and to investigate applications. Id. at 167 (internal quotation marks omitted). The general proposition of law, combined with the statutory responsibility of the Commissioner, convinced the court that the Commissioner had discretion to deny permits for good cause. The Court of Appeals was not persuaded by the petitioner's argument that the Administrative Code provided that the Commissioner "shall" issue licenses. The court held, "It seems apparent that the word 'shall' merely empowers the Commissioner to issue a license, and does not mandate him to do so in the case of an applicant found unfit." Id. at 171.

Barton establishes that a licensing official in New York has the implicit authority to deny a license or permit for good cause, and that good cause at least includes an applicant's unfitness. But Barton does not completely resolve the matter here; DSNY denied Plaintiff's permit because New York City did not need any additional transfer-station capacity not because Plaintiff is unfit to operate its transfer station. The Court does not read Barton to free New York administrative officials from all constraints in the exercise of discretion to deny a license for good cause. Although Barton may establish that DSNY has discretion to deny permits and the discretion to do so on the basis of an applicant's fitness, it does not mandate that DSNY necessarily has the discretion to deny permits based on local need. Because the Court must determine the degree of DSNY's discretion, and not merely the existence of some discretion alone, see RRI Realty Corp., 870 F.2d at 921, Barton's rule does not completely resolve the matter.

It does not seem that the New York Court of Appeals has broadened Barton beyond licensing officials' inquiry into applicants' fitness, a form of discretion not relevant here. See, e.g., Midan Rest. Co. v. Tarshis, 498 N.E.2d 424, 425 (N.Y. 1986) (holding that denial of permit to operate a sidewalk café was properly based on an agency's determination that the applicant lacked good character and fitness for the permit); Employers Claim Control Serv. Corp. v. Workmen's Comp. Bd., 323 N.E.2d 689, 691 (N.Y. 1974) (holding that a licensing board had authority to deny licenses on the basis that the applicant was unfit because it could not comply with a proper rule of the licensing board); CC Lumber Co. v. Waterfront Comm'n of N.Y. Harbor, 292 N.E.2d 1, 6 (N.Y. 1972) (holding that an administrative agency responsible for licensing waterfront businesses had discretion to deny license on the basis that the applicant lacked good character and integrity). But that is also not to say that Barton may not fairly be applied to situations beyond applicant fitness. Here, as in the regime that Barton interpreted, the Administrative Code provides that DSNY "shall issue permits." N.Y. City Admin. Code § 16-131(c). The Court of Appeals held that such language in a statute that governs agency licensing authority merely provides for the power to grant permits and does not make the agency a rubber-stamping mechanism. See Barton, 165 N.E.2d at 171. The same reasoning could be applied to DSNY's authority here.

It also is not clear that the New York Court of Appeals would apply the canon inclusio unius est exclusio alterius, on which Plaintiff relies, in interpreting the Administrative Code. The Court of Appeals has applied the maxim four times in reported cases. See Presbyterian Hosp. in the City of N.Y. v. Md. Cas. Co., 683 N.E.2d 1, 6 (N.Y. 1997); Uribe v. Merchants Bank of N.Y., 693 N.E.2d 740, 743 (N.Y. 1998); Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 472 N.E.2d 315, 318 (N.Y. 1984); Woodmere Acad. v. Steinberg, 363 N.E.2d

29

1169, 1172-73 (N.Y. 1977). Only one of these cases, however, apply the canon to questions of statutory interpretation and it does not convince the Court that the canon would be applied here.[9]

In <u>Presbyterian Hospital</u>, the Court of Appeals interpreted the New York Insurance Law and Insurance Department regulations to hold that an insurance company could be precluded from asserting as a defense to a suit to recover benefits that the insured was intoxicated at the time of an automobile accident when the insurance company failed to timely pay or deny the claim. <u>See</u> 683 N.E.2d at 2. An Insurance Department regulation states, "Failure by an insurer to notify the applicant of its denial of the claim within [10 business days] after its determination shall not preclude the insurer from asserting a defense to the claim which is based upon the reasons for such denial." N.Y. Comp. Codes R. & Regs. tit. 11, § 65.15(g)(5). A provision of the Insurance Law and another regulation, however, provide that insurers must pay or deny claims for no-fault automobile insurance benefits within 30 days from the date the applicant supplies proof of a claim. N.Y. Ins. Law § 5106(a); N.Y. Comp. Codes R. & Regs. tit. 11, § 65.15(g)(3). Failure to comply with those provisions requires the insurer to pay the requested benefits with interest and attorney's fees. <u>Presbyterian Hosp.</u>, 683 N.E.2d at 2-3. The insurer in <u>Presbyterian Hospital</u> relied on section 65.15(g)(5) to argue that, even though it did not pay or deny the benefits within 30 days, its defense that the insured driver was intoxicated at the time of the accident could not be precluded. <u>See</u> <u>id.</u> at 4.

_____

[9] The Court of Appeals looked to the canon in <u>Uribe v. Merchants Bank of New York</u>, 693 N.E.2d 740, 743 (N.Y. 1998); <u>Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty Associates</u>, 472 N.E.2d 315, 318 (N.Y. 1984); and <u>Woodmere Academy v. Steinberg</u>, 363 N.E.2d 1169, 1172-73 (N.Y. 1977), as a maxim of contract interpretation. In <u>Uribe</u>, the contract contained language such as "solely" and "only," suggesting that what was included was meant to be exclusive. <u>See</u> 693 N.E.2d at 741. In <u>Two Guys From Harrison-N.Y.</u> and <u>Woodmere Academy</u>, the court applied the canon as a means to construe the contracts against their drafters, an interpretive rule not applicable to statutes. <u>See</u> <u>Two Guys From Harrison</u>, 472 N.E.2d at 743; <u>Woodmere Acad.</u>, 363 N.E.2d at 1172-73.

The Court of Appeals held that the nonpreclusion provision in section 65.15(g)(5), setting the consequences of failure to notify an applicant within 10 days that a claim had been denied, suggested that the failure to include such a provision in the regulation and statute addressing an insurer's obligation to approve or deny an application within 30 days was a purposeful omission. See id. at 6. The court applied the principle that "the failure of the Legislature to include a matter within a particular statute is an indication that its exclusion was intended." Id. (internal quotation marks and alteration omitted). Thus, the court stated, "The interpretative canon of inclusio unius, exclusio alterius helps us to conclude that had the Superintendent or Legislature intended to foreclose preclusion as a remedy in the 30-day time lapse circumstance . . . they would have done so again . . . ." Id.

Presbyterian Hospital has uncertain application to interpretation of the Administrative Code. It is not clear the court's holding that the omission of a specific provision in a statute or regulation is to be deemed purposeful when such a provision is included in a related statute or regulation applies here. As far as the Court is aware, the statutory authority for DSNY's discretion on matters other than transfer-station permits does not include an express provision for the denial of permits based on local need. Although Presbyterian Hospital also cited a general principle that the failure to include a provision in a statute suggests that it was intentionally excluded, see 683 N.E.2d at 6, application of that principle to agency discretion would bring that case into conflict with Barton's holding that the parameters of agency discretion need not be expressly stated, see Barton, 165 N.E.2d at 166.

The preceding discussion leaves the Court with the conclusion that the degree of DSNY's discretion to deny permits is uncertain as a matter of New York law. In Natale v. Town of Ridgefield, 170 F.3d 258 (2d Cir. 1999), the Second Circuit held that "uncertainty as to the

31

meaning of state law requirements preclude[s] . . . claim[s] to . . . permits from achieving the degree of certainty necessary to accord [plaintiffs] constitutionally protectable property." Id. at 259. It is the plaintiff's burden to show that "at the time the permit was denied, there was no uncertainty regarding his entitlement to it under applicable state or local law." Id. at 263 n.1. In Natale, the Second Circuit stated:

> [I]f uncertainty as to the law did not preclude recognition of a federally protectable property interest, permit claimants would regularly be entitled to present to federal courts their disputes concerning interpretation of local and state land use regulations. Just as federal courts are not to be turned into zoning boards of appeals, they are also not to be substituted for state courts as adjudicators of the meaning of zoning and other land use regulations.

Id. at 263.

The amount of discretion that DSNY possesses in denying permits is too uncertain to support a constitutionally protected property interest. The New York Court of Appeals has not resolved the issue, and the only case that the Court has located interpreting the relevant provisions of the City Administrative Code is an unpublished trial-court decision. The Court is not fully persuaded by Todino because the court there relied on a precedent that may only apply when an administrative licensing authority has denied a permit based on an applicant's fitness to perform the functions for which state or local law requires that it be licensed. Barton, however, may also be applied to render the "shall issue" language in Administrative Code section 16-131 no more than an establishment of DSNY's authority to issue permits for fill-material transfer stations and not a requirement that DSNY do so in all cases. Finally, it is not clear whether the New York Court of Appeals would turn to the interpretative canon inclusio unius est exclusio alterius to hold that DSNY only has discretion to deny permits on the grounds expressly provided in Administrative Code section 16-131.1.

Because the local law that gives rise to DSNY's discretion is uncertain, and indeed the only case located sides with Defendants, Plaintiff cannot establish that it has a federally protectable property interest in the permit. This federal Court is no more the proper place to adjudicate the uncertain meaning of the City Administrative Code than it is to appeal administrative zoning decisions.

Plaintiff's second argument as to its property interest relies on dicta in Todino. The New York Supreme Court stated:

> It may be argued . . . that while a decision on whether to issue a permit is discretionary, the processing of the application is a ministerial duty. Thus, if

> Todino could show that its completed application was receiving incommensurate treatment, or that the DSNY continues to process applications while having rejected that of Todino, then . . . . the DSNY would have clearly exceeded its authority and engaged in impermissible refusal to properly execute its ministerial duties [to process applications].

Todino, slip op. at 6-7. Based on this language, Plaintiff argues that, even if it lacks a protectable interest in obtaining a new permit, it has a property right to have its permit application fully processed. When DSNY terminated the environmental review of the proposed modified permit, the argument goes, the agency failed to complete a ministerial task from which it had no discretion to depart.

While the Plaintiff's first argument addresses DSNY's discretion to deny permit applications, the second argument concerns the manner in which such applications may be denied. Plaintiff seeks to assert a property interest in a specific process rather than in the end of that process. Both the Supreme Court and the Second Circuit have rejected claims of a cognizable property interest in the process for receiving a benefit. See Olim v. Wakinekona, 461 U.S. 238, 250-51 (1983) ("Process is not an end in itself . . . . The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right."); McMenemy v. City of Rochester, 241 F.3d 279, 287 (2d Cir. 2001) (holding that there was no property interest in a specific civil-service examination when the plaintiff had no property interest in the job itself); Schwartz v. Mayor's Comm. on Judiciary, 816 F.2d 54, 57 (2d Cir. 1987) (holding that the plaintiff lacked a property interest in the procedures by which a candidate for judicial-office reappointment was considered); see also Clemente v. United States, 766 F.2d 1358, 1364 (9th Cir. 1985) ("A mere command to follow certain procedures . . . does not create an underlying property interest."); Bigbie v. City of Chicago, 766 F.2d 1053, 1056 (7th Cir.

1985) (holding that state law mandating a civil service examination did not create a property interest because "it is not the examination that the applicant is interested in—no one likes taking tests—but the job.").

The plaintiff in McMenemy was denied a promotion on the basis of an allegedly improper civil-service examination. See 241 F.3d at 287. The Second Circuit held that the plaintiff had no cognizable property interest in the promotion sufficient to support a claim under § 1983 for deprivation of his due process rights. See id. at 286-87. The plaintiff also argued that he had a property interest in the procedures by which he applied for the promotion, that is, in the examination itself. Id. at 287. The court held that "because [the plaintiff] had no legitimate claim of entitlement to and therefore no property interest in the position to which he aspired, the procedures used to fill that job are immaterial to his due process claim." Id. The Second Circuit reasoned that "[a]n examination is not an end in itself; it has value only because it may lead to something valuable." Id.

Similarly, Plaintiff has no entitlement to the procedures by which DSNY processes permit applications, even if those procedures are required as a matter of state or local law. As the Second Circuit held in McMenemy, process is not property. See id. Plaintiff accordingly has no property interest in the processing of its permit application.

### (c)    Plaintiff Lacks a Cognizable Liberty Interest

Plaintiff's claim that it has a liberty interest in pursuing an occupation or business requires a different analysis. Liberty is harder to define than property: "While property exists in concrete entitlements secured by independent sources of law, liberty interests cannot be so easily characterized." Bank of Jackson County v. Cherry, 980 F.2d 1362, 1367 (11th Cir.); see also Baden v. Koch, 799 F.2d 825, 829 (2d Cir. 1986) ("It is not easy for a court to determine

34

whether what the plaintiff calls a liberty interest falls within the constitutional concept of liberty.").  Plaintiff argues that it has a liberty interest in the freedom to pursue its business as an operator of fill-material and construction-debris transfer stations.  The Due Process Clause does encompass the right "to engage in any of the common occupations of life."  <u>Roth</u>, 408 U.S. at 572.  And this concept of liberty protects corporations as well as individuals.  <u>Trifax Corp. v. District of Columbia</u>, 314 F.3d 641, 643 (D.C. Cir. 2003).  As the Second Circuit noted in <u>RRI Realty Corp.</u>, applicants who are denied licenses necessary to pursue a particular type of occupation or business need not show an entitlement to the license to state a claim.  870 F.2d at 918 n.4 (citing <u>Wilkerson v. Johnson</u>, 699 F.2d 325 (6th Cir. 1983)).  Notwithstanding this principle, Plaintiff has not been denied the opportunity to engage in its chosen occupation or business here.

Plaintiff relies on <u>Wilkerson</u> for its liberty argument, but that reliance is misplaced.  In <u>Wilkerson</u>, the Sixth Circuit held that applicants for a license to operate a barber shop had a protectable liberty interest in the freedom to choose and to pursue a career that was infringed when the defendants, one of whom was a member of the state licensing board and whose business would be harmed by the opening of a new shop, deliberately misapplied state licensing law against the applicants, temporarily preventing them from establishing the barber shop.  <u>See id.</u> at 328-29.  The Sixth Circuit, however, subsequently limited the proposition expressed in <u>Wilkerson</u>.  <u>See</u> <u>Parate v. Isibor</u>, 868 F.2d 821, 831-32 (6th Cir. 1989).  The court in <u>Parate</u> held that <u>Wilkerson</u> was confined to situations in which individuals are precluded from entering an economic field and had no application to the regulation of individuals' conduct while engaged in that business.  <u>Id.</u>  Applying <u>Wilkerson</u> (which the Second Circuit noted with some minimal degree of approval in <u>RRI Realty Corp.</u>, 870 F.2d at 918 n.4) to the present case, Plaintiff has no

liberty interest in expanding its fill-material capacity; it has not been denied entry into the fill-material business and indeed continues to operate its transfer station. Accordingly, its due process claims related to the modification of its fill-material permit are not based on a cognizable liberty interest.

Plaintiff's purported liberty interest in the construction-debris transfer station business must meet a similar fate. Plaintiff is not denied the ability to engage in the transfer-station business because it cannot expand its operations to process construction debris along with fill material. It is not wholly prevented from engaging in its chosen business; rather, it simply complains that the City regulations impermissibly limit the amount of business it can do. But the Due Process Clause does not protect the claimed liberty of maximizing one's business or profit merely because it guards against government prohibition of entry into that business altogether. Plaintiff therefore has no liberty interest that can sustain its due process claims. Because Plaintiff has neither a property nor liberty interest, its due process claims are dismissed.

### 4. Plaintiff Has Not Stated a Claim For Tortious Interference With Prospective Business Advantage

Plaintiff's claim for tortious inference with prospective business advantage must be dismissed for failure to state a claim.[10] Under New York law:

> No action shall be prosecuted or maintained against a city . . . for personal injury, wrongful death or damage to real or personal property alleged to have been sustained by reason of the negligence or wrongful act of such city . . . or of any officer, agent or employee thereof . . . unless . . . a notice of claim shall have been made and served upon the city . . . in compliance with section fifty-e of this chapter . . . .

---

[10] Plaintiff labels its Tenth Claim for Relief as "Tortious Interference with Prospective Business Advantage." (SAC at 27.) Defendants interpret the allegations as an attempt to alleged tortious interference with contract as well as prospective business advantage. To the extent that Plaintiff seeks to assert a cause of action against the City for tortious interference with contract, it must be dismissed for the same reasons stated herein.

N.Y. Gen. Mun. L. § 50-i(1). The tortious-inference claim falls within this provision because it is a claim regarding damage to property due to the wrongful acts of the City or its agents. Plaintiff had 90 days after the claim arose to serve a notice of claim, was required to plead in the complaint that at least 30 days had passed since service of the notice, and that the claim had been refused. Id. §§ 50-e(1)(a), 50-i(1)(b). Timely service of a notice of claim is a prerequisite to suit, without which a plaintiff fails to state a claim. See Arum v. Miller, 304 F. Supp. 2d 344, 348 (E.D.N.Y. 2003) ("The failure to comply with these [notice-of-claim] requirements generally requires dismissal for failure to state a claim."); Wren v. N.Y. City Health & Hosps. Corp., 104 F.R.D. 553, 557 (S.D.N.Y. 1985) ("A complaint asserting tort claims against a municipality or other state agency must allege compliance with N.Y. Gen. Mun. Law §§ 50-e and 50-i or it will be dismissed for failure to state a cause of action."); Pravda v. County of Saratoga, 680 N.Y.S.2d 705, 706 (App. Div. 1998) (same); Pretino v. Wilson, 444 N.Y.S.2d 190, 191 (App. Div. 1981) (same).

Plaintiff does not allege in the complaint to have served any notice of claim, but instead maintains in its brief that Defendants should be estopped from asserting failure to file a notice of claim because Defendants somehow induced Plaintiff not to file applications for additional permits and lawsuits challenging Defendants' actions. Estoppel in the context of notice of claims may only be invoked "sparingly" and "under exceptional circumstances." Luka v. N.Y. City Transit Auth., 474 N.Y.S.2d 32, 34 (App. Div.), aff'd 468 N.E.2d 706 (N.Y. 1984). "The doctrine of equitable estoppel applies only 'where a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice.'" Id. (quoting Bender v. N.Y. City Health &

Hosps. Corp., 345 N.E.2d 561, 564 (N.Y. 1976)). There is no allegation in the complaint that suggests Defendants induced Plaintiff not to serve a notice of claim within 90 days of accrual of its cause of action, and Plaintiff has not suggested any factual basis in its brief for such inducement. Instead, Plaintiff makes conclusory and unfounded statements in its brief to argue that the claims should proceed to discovery. The tortious- interference claim against the City is therefore dismissed for failure to comply with New York General Municipal Law sections 50-e(1)(a) and 50-i(1).

It is not clear that the notice-of-claim requirements apply to the tort claim against Doherty, especially in so far as it alleges he acted outside the scope of his authority. Whether or not Plaintiff has failed to state a cause of action against Doherty for failure to serve a notice of claim on the City, it has failed to allege the necessary elements of tortious interference with prospective business advantage. Plaintiff must plead that: (1) it had a business relationship with a third party, (2) Doherty knew of that relationship and intentionally interfered with it, (3) Doherty acted with the sole purpose of harming Plaintiff or used wrongful means to do so, and (4) injury to the business relationship. Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003); Nadel v. Play-By-Play & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000). [11] Plaintiff must establish as to the second element that it "would have gotten [a] contract but for the defendant's interference." Mandelblatt v. Devon Stores, Inc., 521 N.Y.S.2d 672, 677 (App. Div. 1987) (internal quotation marks & citations omitted). Wrongful means include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic

---

[11] Plaintiff cannot succeed on a claim for tortious interference with contractual relations because it has not alleged that Defendants induced the breach of any existing contract it had with a third party. See NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 664 N.E.2d 492, 495 (N.Y. 1996).

pressure." <u>NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.</u>, 664 N.E.2d 492, 497 (N.Y. 1996).

Even assuming that the tort could be applied to a market regulator as opposed to a competitor in the market, Plaintiff does not allege that it had any specific business relationship with which Defendants interfered and therefore has failed to plead that but for Doherty actions it would have consummated a business relationship. In addition, Plaintiff does not plead that Doherty knew of any prospective business relationship and acted to prevent the fruition of Plaintiff's economic prospects. Nor does Plaintiff allege facts that, if true, would show Doherty acted to harm Plaintiff's prospective business relations. The facts alleged in the complaint suggest that DSNY denied Plaintiff's permit not out of malice but because New York City did not need additional private transfer-station capacity, which may or may not amount to economic protectionism. And at least 20 other applications were denied for the same reason, belying any notion that the purpose of denying Plaintiff's application was malicious or wrongful. Finally, Plaintiff offers no rebuttal to Defendants' argument that it has failed to plead that wrongful means were used to prevent consummation of the unspecified business relationships. The complaint does not allege that Doherty used physical violence, fraud or misrepresentation, filed civil suits or sought criminal prosecution, or applied any undue economic pressure to stifle Plaintiff's business prospects. Accordingly, Plaintiff has failed to state a cause of action against Doherty and the City for tortious interference with prospective business relations.

### C.     Plaintiff's Request for Leave to Replead is Denied

Plaintiff requests that it be permitted to replead any claim dismissed on Defendants' motion. Federal Rule of Civil Procedure 15(a) requires permission of the Court to amend a pleading when, as here, the party has already amended the pleading once before. Fed. R. Civ. P.

15(a).  The Court must freely give leave to amend when justice so requires.  The decision to deny amendment is within the Court's discretion, but good reason must be given for denial.  Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir. 1995).  Good reasons include prejudice to the opposing party and that an amendment would be futile.  Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002).

Amendment here would be both prejudicial and futile.  Discovery has proceeded while the instant motion was pending.  Allowing permission to replead would prejudice Defendants by reopening and perhaps redirecting discovery.  See Grace v. Rosenstock, 228 F.3d 40, 54 (2d Cir. 2000).  In addition, Plaintiff has already amended its complaint twice, once as of right and once with leave of the Court.  There is nothing to suggest that what the Plaintiff could not add in the first two amendments it can add to save its dismissed claims now.  Plaintiff contends that it has additional, unspecified material with which it can supplement its complaint; it has not, however, even generally explained how that material would change the allegations in the SAC so as to make the dismissed claims viable.  Leave to replead is accordingly denied.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's claims for a taking without just compensation are dismissed because they are not ripe. The procedural and substantive due process claims and the claim for tortious interference with prospective business advantage are dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants' motion to dismiss as to the equal protection and Commerce Clause claims is denied. Finally, Plaintiff's request for leave to replead the claims that the Court has dismissed is also denied.

**So Ordered:**  New York, New York
July 15, 2005

_Richard Conway Casey_

_____

**Richard Conway Casey, U.S.D.J.**